## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 1:15-cr-10149-5-RWZ |
| | ) | |
| | ) | |
| ISRAEL DELACRUZ, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM/FINAL ARGUMENT AFTER EVIDENTIARY HEARING ON HIS MOTION TO SUPPRESS EVIDENCE

The defendant, Israel Delacruz, through his undersigned attorney, presents this memorandum as his final argument after the close of evidence on his motion to suppress cocaine taken from between his buttocks by Boston Police during a body cavity search on October 14, 2014.

## BACKGROUND

In 2014, the Boston Police Department (BPD), assisted by other state and federal agencies, conducted "Operation Rising Tide", an investigation of suspected heroin and cocaine trafficking centered around Columbia Point in South Boston. As part of the investigation, various telephone wiretaps were authorized. On October 14, 2014 monitors intercepted several telephone calls between co-defendants Ismael Vasquez ("Vasquez") and Ileana Valdez ("Valdez"), the content of which indicated that a courier would deliver 125 grams of cocaine to Mr. Vasquez's residence at 96 North Point Drive, Columbia Point, South Boston, in the late afternoon.

## Testimony

Detective Ismael Henriquez ("Henriquez"), Sergeant Detective Paul W. Murphy,

Jr. ("Murphy"), police officer Robert England ("England"), all of the Boston Police

Department, and the defendant, Mr. Delacruz, testified at the suppression hearing.

**Detective Ismael Henriquez**

On October 14 Henriquez was assigned to the surveillance team in the area of

Columbia Point, Suppression Transcript 1, October 13, 2016, page 13 (hereafter, "Tr. 1,

page # "), specifically near the Harbor Point housing development, arriving there in his

vehicle at approximately 2:00 or 2:15 p.m.  Id. 14.  Upon arrival at 96 North Point Drive

he noticed a white Mercedes parked in front of the residence.  He took down the license

plate number and later learned that the owner of the car was the defendant, Mr.

Delacruz.  Id. 16, 18-19.  Officer Adolfo Briton, another member of the team, parked his

undercover vehicle opposite the front door at 96 and videotaped activity in the area;  he

broadcast his observations to the team.  Id. 21.

<u>**Sergeant Detective Paul W. Murphy, Jr.**</u>

Sergeant Murphy was supervising the Rising Tide investigation.  Tr. 1, p. 24.  He

knew Valdez to be a major supplier of cocaine and heroin in the investigation.  Id. 25.

While investigating her for months, he had supervised various undercover purchases of

cocaine and heroin from her.  Id.

On the 14th he was "supervisor of street surveillance"  Id. 26.  He and other

members of his squad were on the street receiving information broadcast by a central

dispatcher and by monitors listening to intercepted calls.

Murphy found it unusual that Vasquez would order cocaine instead of heroin

from Valdez.  Id. 33.  But he later learned that Vasquez was buying the cocaine on

2

behalf of someone else: "friends", "my people", or "my family".  Id. 33.  Surveillance was

present at 52 Blue Hill Avenue in Roxbury, previously identified as a "stash" house for

Valdez.  Id. 31-32.

Murphy heard that Henriquez and Briton had sent out the Mercedes plate

number for a registry check which revealed the defendant as the owner of the car. Id.

34.  Upon hearing the name and then seeing a registry photograph of Delacruz, Id. 63,

Murphy recognized the defendant as someone he had known of for "at least ten years"

and had investigated for alleged cocaine dealing.  Id. 34.  He had once obtained a search

warrant for Mr. Delacruz's automobile.  Id.   But a subsequent search came up empty.

Id. 57.   Nevertheless Murphy testified that he knew of Delacruz "because I'm a drug

investigator for a long time."  He "believed him to be a cocaine dealer",  Id. 34, and "a

slick son of a bitch."  Id. 57.  That background accordingly had meaning for him.  He

explained,

> "Well, -- I mean, ... Vasquez was a heroin dealer.  He orders
> cocaine, a large amount.  He says it's not for him.  It's for my
> people.  And they have a cocaine dealer.  They're [1] waiting for him.
> So, to me, he's the one Vasquez is ordering the cocaine for. That's
> my state of mind."
>
> Id. 35.

Meanwhile Murphy was informed by surveillance at 52 Blue Hill Avenue that a

previously identified drug courier was observed driving away from that address and

that the "drug delivery was on the way."  Id. 37.  At that point in the hearing, the

prosecutor played several of the video tapes taken by Officer Brito at 96 North Point

Drive.  Id. 37-44.  The transcript shows that Detective Murphy identified both Vasquez

and Delacruz outside the house on the street at various times.  E.g. Id. 39, 40, 43.  There

---

[1] Perhaps should be "There".

were other individuals with Vasquez in some of the videos but Murphy could not

identify them.  Id. 40, 60, 61. [2]  Vasquez and Delacruz exited the house after Jimmy had

driven away in the Toyota.  Id. 43.  When the defendant drove away in his Mercedes,

Murphy made the decision that,

> "We were going to follow it out a distance away, far enough away from 96
> North Point Drive and then stop it."
>
> Id. 44.

Detective Murphy then described the pursuit of and eventual encounter with Mr.

Delacruz at the South Bay Mall.  En route he "completely" believed that the defendant

was in possession of drugs.  Id. 46.  On arrival at the South Bay Mall, Mr. Delacruz

parked in front of the Best Buy store.  While still seated in the vehicle he was

approached by Officer England and Lieutenant Martin Conley of the state police.

Detective Murphy filmed part of the encounter [3] from inside his parked vehicle a short

distance away.   The clip lasts for one minute and two seconds.  It begins while England

and Conley are standing next to the driver's door speaking to the defendant.  At 33

seconds, Mr. Delacruz is seen alighting from the car.  There is conversation between the

---

[2]  Under cross-examination, Detective Murphy was shown several portions of the video
tapes depicting  Vasquez meeting with other unknown individuals on the sidewalk and
street in front of and also inside his house.  Id. 59, 61, 62, 65, 66, 67, 69, 72.  See especially
DVD disc, video track, M2U01485, Exhibit 1. Tr. 1, 60; Exh. 1, M2U01489, (Vasquez
meeting outside the open driver's door of a dark grey Honda, Massachusetts
Registration No. 675 ZX8, parked perhaps two doors up the street.  He is counting
currency in his hands) Tr. 1, 66-67; Almost immediately after Delacruz drove away from
the area, Exh. 1, M2U01499, Tr. 1, 72, the video, Exh. 1, M2U01500, shows Vasquez
milling about  and conversing with three other males, one of whom is speaking on a cell
phone, in an area between two townhouses across the street.  Id. 72-73.  Officer Brito did
not relay any of these encounters to the team.  e.g. Id. 64, 65, 69, 72-73.  Nor did
Murphy ask Brito if he observed anyone else during his filming.  Id. 64 ("I never ask
him that.").

[3]  Exh. 1, 10-14-14 Video Delacruz Arrest

three and Delacruz pulls his wallet from his pocket and places it on the roof of his car to his left. As he does this England bends over to pick something up. With head down he seems to be observing whatever it is while Conley continues speaking to the defendant. The video ends as Murphy decides to approach the group to assist England and Conley. Tr. 1, 48. He testified that the defendant was being handcuffed by England as he walked over to them. He said that England told him that "he had felt something in the back of his pants." Murphy told England to arrest the defendant and take him to the District-4 police station. Id. 49.

On arrival at the station, the defendant was placed in a holding cell near the booking area. Murphy obtained permission from the duty supervisor to do "a strip search" of the defendant based on England's statement related above. Id. 49. He felt the applicable BPD rule required "extreme probable cause" to perform a strip search. Id. 50. To him a strip search meant "to move or remove articles of clothing." To "move" in this sense meant "like ... if I pull a shirt up or something like that". Id. The holding cell could fit 15 to 20 people. Id. 51. Murphy said he asked a "number" of officers already at District 4 to assist him, England, Conley and Rioux in the strip search. At least "a couple." Id. He didn't want to have to fight with the defendant, who "was anything but compliant", to accomplish the search. Id. He told Mr. Delacruz repeatedly, "just give it up, hand it over". Id. 52. When the defendant declined, Murphy testified, "I just reached into the back of his pants and I pulled it out." Id. "It wasn't far down, I could retrieve it easily, and I just took it out". Id. Defendant was wearing "loose jeans". Murphy did not pull his pants or underwear down, he "pulled the waistband out with

my hand, just grabbed it. It was right there." Id. He believed it was "inside" defendant's "underpants". Id. He did not believe that any clothing was removed during the search. Id. 53.

On cross-examination Murphy stated that he was familiar with the BPD written rules governing body searches. Id. 83. He believed that the rules and regulations produced in court and marked for identification were applicable to BPD body searches as of October 14. Id. 91. He said he thought the anus would be considered a body cavity, Id. 84, but not "in between the buttocks" because it was not an "orifice". Id. 84. Altogether there were six or seven police officers assisting in the strip search while Mr. Delacruz was probably handcuffed. Id. 85-86. Murphy was directly behind the defendant and the others were surrounding him. Id. 86-87. When he commenced the procedure, Murphy thought it was going to be a "strip search". Id. 89. Contradicting his direct testimony, he said, in fact, he did pull down both Mr. Delacruz's underwear and pants. Id. 95. When the actual bag of cocaine, Exhibit 4, Id. 100, was shown to him he admitted that it was more "elongated" when he originally seized it. Id. The bag did not slip down when he touched it, "it didn't slip down." Id. 101.

**Officer Robert England**

Officer England testified in this matter on two days: October 13 and November 3, 2016. On the first day he said that Mr. Delacruz was still in the car when he approached it. Id. 108. He said to him that he seemed to be "in a rush" and was "driving kind of erratic", was someone "following him, or something?" When Delacruz

6

replied no, "At that time, ma'am, I advised him that he was under arrest and I advised him of his Miranda rights." Id. 109. He then "discussed with him his drug history that I was familiar with." Id. Next, "he was asked to exit the motor vehicle." Id. England again "had further conversation with him ... again about the drugs". Id. While he was counting the money which had fallen out of defendant's hand, Delacruz volunteered that he had pay stubs from his haircutting work. Id. 110.

On November 3, officer England resumed the stand but this time said that he had read Delacruz his rights in the parking lot, after he got out of his car. Tr. 2, p. 7-8. He did not repeat that he had placed him under arrest on initial contact. Id. He said that defendant became "agitated" during the money-counting, "looking over his shoulder" and "moving his arms back and forth" Id. 10. England said that, due to this behavior and defendant's physical bulk and stature, "I advised him" that "I was going to just handcuff him for my own safety." Id. 10. Defendant submitted to the restraint without resistance. Id. 11.

While handcuffing defendant's hands behind his back, England said that the back of his hand inadvertently felt a "lump" around "the tailbone of his body." Id.

On cross-examination, England acknowledged that when he felt the lump he considered that the "threshold inquiry was over" and Delacruz was under arrest. Id. 35. He believed the lump was actually at the bottom of defendant's tailbone. Id. 34. He reverted back to his admission that Delacruz was still in the car when he read him the *Miranda* rights. Id. 24. As to the body search at the station, England had said on direct examination that Sergeant Murphy "lowered the back of the pants that he

7

[defendant] had and reached in and removed an item". Id. 14.  The pants were lowered to "where the back of your waist meets your tailbone." Id. 16.

## Mr. Delacruz

The defendant testified that he was still inside his vehicle when the police officers approached him. Tr. 2, p. 38.  They had parked their unmarked cruiser with blue lights lit and flashing strobe close behind him. Id. 39.  England asked him if he had ever been arrested for drugs.  When he said yes, he was read his rights and ordered out of the car.  Id.  Several times he asked why he was being arrested?  Id. 39, 41, 42, 43. Lieutednant Connolly told him to empty his pockets.  Id. 41.  England pushed him against an adjacent vehicle, roughly pat-frisked him and attempted to pull his pants down.  Id. 43.  He resisted.  Id. 44.  They eventually transported him to the police station where he was placed in the holding cell surrounded by five to eight officers while still handcuffed.  They were swearing at him, verbally abusing him, calling him e.g. a "slick mother f***er".  They bent him over at the waist.  Murphy "pulled my pants and underwears [sic] down and went in between my buttocks area -- and he started reaching in there"  Murphy shouted, "I told you I would get you, mother f***er!"  Id. 45. The bag of cocaine was retrieved from defendant's "anal area".  Id. 46.  The defendant demonstrated in court that the waist of his pants had been well below his hips before Murphy removed the drug bag.  Id. 46-47.   The experience disturbed him that day and every time he thought of it thereafter.  Id.

## Argument

### A.  No Probable Cause for *de facto* Arrest and Subsequent Search.

The officers had reasonable suspicion under <u>Terry v. Ohio</u> 391 U.S. 1 (1968) to

stop Mr. Delacruz and investigate further the possibility that he had been the recipient of the cocaine likely delivered to Vasquez at 96 North Point Drive. They did not, however, at the time they seized the defendant in the South Bay Mall, have probable cause to arrest him. Murphy knew only that the delivery had likely been made, that Delacruz had met with Vasquez and that he was someone he had long suspected of being a drug dealer. England knew no more. Nevertheless, a reasonable person in the circumstances that Mr. Delacruz experienced at the mall would have concluded that he was under arrest prior to the moment that officer England supposedly felt a bulge in the defendant's pants. He was accosted in a narrow space between vehicles by police in plain clothes who arrived with flashing lights in an unmarked cruiser. England had already told him that he was under arrest and read him his *Miranda* rights. He repeatedly asked the officers why he was being arrested. England's suspicious questioning (what was he rushing away from, was he being followed, was he previously arrested for drugs??), and his methodical counting of the cash while ignoring an offer of paystubs to justify the amount, would have contributed to defendant's belief that he was under arrest. A *de facto* arrest occurs "when a 'reasonable man in the suspect's position would have understood his situation,' in the circumstances then obtaining, to be tantamount to being under arrest." Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004)(citations omitted). The inference of arrest from the circumstances is strong.

England's subjective opinion that Delacruz was not under arrest until he felt the bulge is of no import. United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001)("The

subjective intent of the agents is not relevant...and it has no bearing on determining whether police conduct transformed an investigative stop into a *de facto* arrest"). Thus, at the moment that England moved to handcuff Mr. Delacruz, an arrest occurred. As this was before the detection of the lump in his pants, that evidence may not be considered in determining whether there was probable cause for the arrest. *See* <u>Wong Sun v. United States</u>, 371 U.S. 471, 488, 83 S. Ct. 407 (1963)(fruits of the poisonous tree); *see also* <u>United States v. Barnes</u>, 506 F.3d 58, 63 (evidence excludable where illegal search the 'but for' cause of its discovery).

**B. Illegal Body Cavity Search.**

"A "manual body cavity search" involves some degree of touching or probing of body cavities". <u>Blackburn v. Snow</u>, 771 F.2d 556, 561 (1st Cir. 1985)(n.3) (citation omitted). "At a minimum, ...[it is] "highly intrusive" and humiliating." <u>Id</u>. (citing <u>Tribble v. Gardner</u>, 860 F.2d 321, 324 (9th Cir. 1988)). As body cavity searches are such an intrusive invasion of an individual's physical integrity, they should generally only be permitted under appropriate procedural safeguards. The Fourth Amendment prohibition against unreasonable searches is assessed under the unique circumstances of each case. <u>Bell v. Wolfish</u>, 441 U.S. 520, 559, 99 S. Ct. 1861 (1979).

> "The test of reasonableness under the Fourth Amendment is not capable of precise particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."
>
> <u>Id</u>.

Applying that criteria, one can readily conclude that the rules and procedures, specifically "*Rule 318D - Strip Search, Visual Body Cavity, and Body Cavity Search*

10

*Procedures"*, Exhibit A, attached, of the Boston Police Department define the boundaries of reasonableness for the body cavity search in this case.  Detective Murphy acknowledged that.

The standard adopted for justifying a body cavity search under Rule 318D is "a high degree of probable cause"  Exh. A, p. 1.  Detective Murphy testified that he believed he had "extreme probable cause", Tr. 1, p. 50, to conduct a search of the defendant at the station.  He kept referring to the search as a strip search.  But a strip search under the rule requires only probable cause, Exh. A, p. 1, so it is fair to assume that whether Murphy actually performed a strip search or a body cavity search he believed there was sufficient cause for what he did.  He did a body cavity search.

Although Murphy's testimony was inconsistent regarding whether the drug bag was located in defendant's pants or his underpants, several factors support a finding by this Court that the bag was secreted between his buttock cheeks with the lower end likely protruding into his anal area.  First, officer England's testimony, unlike Murphy's, was definite and consistent: he felt the "lump" or "bulge" at the defendant's tailbone.  Second, the tailbone, or "coccyx":

> is a small bone that articulates with the sacrum and that usually consists of four fused vertebrae which form the terminus of the spinal column at the found at the very base of the spine.

> Merriam-Webster Medical Dictionary
> http://www.merriam-webster.com/dictionary/tailbone

Third, as the correct anatomical drawing attached as Exhibit B shows, the tailbone is located well below the top of the hips.  England was very definite, he felt the lump "just below the tailbone."  Tr. 2, p. 34.  The bag must have been at least five to six inches in its

11

"elongated" state. Murphy would have grabbed the top end of the bag, "it didn't slip down", meaning that at least a good portion, if not all of it, must have been lodged between defendant's buttocks. The seam of the buttocks runs directly to the anal area. The anus is a body cavity. Exh. A, Section 2. Therefore, the bag of cocaine was partially lodged in the anal body cavity area. Under Rule 318D, the search of a body cavity <u>requires a search warrant</u>. Id. Sec. 1, 3. That is true, "even if an object is seen partially protruding from a body cavity." Id. Sec. 1.

A warrant was readily procurable. It was only about 6 p.m. when the search took place. It would have been easy to maintain observation of the defendant pending the receipt of the warrant. The failure to provide these safeguards and to instead proceed willfully forward in contravention of them was glaringly unreasonable. As such it was a violation of the Fourth Amendment and the appropriate remedy is suppression of the evidence.

## <u>Conclusion</u>

For the reasons stated above, the defendant respectfully requests that his motion to suppress be allowed and for any other relief the Court deems meet and just.

Respectfully submitted,

January 13, 2017 **ISRAEL DELACRUZ,**

By his attorney

/s/ Raymond E. Gillespie
Raymond E. Gillespie
BBO No. 192300
875 Massachusetts Ave  Suite 32

Cambridge, Massachusetts  02139
Telephone – (617) 661-3222
Facsimile –  (978) 274-2698
rgillespie1@prodigy.net


## CERTIFICATE  OF  SERVICE

I hereby certify that the foregoing has been served on the above date upon all persons listed in the Notice of Electronic Filing entered in the CM/ECF system in connection with this case.

/s/ Raymond E. Gillespie

_____
Raymond E. Gillespie

finalargue 011317

# EXHIBIT A

# Boston Police Department Rule 318D

**Rules and Procedures**
**Rule 318D**
**December 13, 2005**

**Rule 318D - STRIP SEARCH, VISUAL BODY CAVITY SEARCH, AND BODY CAVITY SEARCH PROCEDURES**

This rule is issued to establish guidelines, regulations and procedures
outlining when and how strip searches, visual body cavity searches, and
body cavity searches may be performed. It is effective immediately,
superseding all previously issued rules, regulations, orders and other
directives concerning the procedures to be used when searching prisoners.  Officers shall conduct these searches with due recognition and deference
for the human dignity of those being searched.

Sec. 1 GENERAL CONSIDERATIONS/PURPOSE:

The purpose of this Rule is to clarify Department policy relative to
custodial strip searches, visual body cavity searches, and/or body cavity searches authorized by a
warrant.

A search conducted incident to arrest may be made only for the purposes
of seizing fruits, instrumentalities, contraband, and other evidence of the
crime for which the arrest has been made, in order to prevent its
destruction or concealment; and removing any weapons that the arrestee
might use to resist arrest or effect his escape (M.G.L. C. 276, s. 1).
A search incident to a lawful arrest can progressively extend into a strip
search, or visual body cavity search, only if the officer has probable
cause to believe that the prisoner has concealed such items on
his/her person or his/her clothing that cannot otherwise be discovered
by the usual search incident to arrest.  Before an officer may command
removal of an arrested person's last layer of clothing, he/she must have
probable cause to believe
that he/she will find a weapon, contraband, or the fruits or
instrumentalities of the crime that he/she could not reasonably expect to
discover without forcing the arrested person to discard all of his/her
clothing.  This Rule will provide guidelines for conducting a strip
search and/or visual body cavity search.

This Rule also clarifies the Department's policy governing body cavity searches. When an officer
has a high degree of probable cause to believe
that an arrestee has secreted contraband and/or weapon(s) in any body
cavity, that officer must seek a warrant pursuant to G.L. c. 276 to
authorize a qualified medical professional to perform a "body cavity

search[.]" This requirement must be strictly adhered to even if an object
is observed partially protruding from the body cavity. (Note: The
exigent circumstances exception to the warrant requirement will
apply if a suspect attempts to swallow contraband in the presence of the officer).

Sec. 2 DEFINITIONS:

- Strip Search: A search that refers to an inspection of a naked individual without any
  scrutiny of his/her body cavities.  It is a
  search in which a detainee is commanded to remove the last layer
  of his/her clothing.
- Visual Body Cavity Search: A search that extends to a visual inspection of the anal and
  genital areas.  The mouth is not
  considered a body cavity.
- Body Cavity Search: A search conducted pursuant to a
  warrant that authorizes a physician to conduct an internal
  manual inspection of any human body cavity.

Sec. 3 ROLE OF DUTY SUPERVISOR:

It shall be the responsibility of the Duty Supervisor to make the
determination whether or not a strip search and/or a visual body
cavity search should be conducted. It shall also be the responsibility
of the Duty Supervisor to make the determination whether to seek a
warrant for a body cavity search.

The Duty Supervisor will ensure that every provision of this Rule is complied with in those cases
where a strip search and/or visual body
cavity search is to be performed.

Sec. 4 STRIP SEARCH AND/OR VISUAL BODY CAVITY SEARCH

Strip searches and/or visual body cavity searches MAY NOT be conducted as a routine part of
the booking procedure.

A strip search and/or a visual body cavity search may ONLY be
conducted if the DUTY SUPERVISOR finds that the suspect is in

custody, and the officer has PROBABLE CAUSE to believe that the
suspect has a weapon, contraband, or the fruits or instrumentalities
of the crime that he could not reasonably expect to discover without
forcing the suspect to discard all of his/her clothing.

After such a finding is made, the Duty Supervisor shall ensure that the following procedures are
followed:

1.  The search will be performed by an officer who is the SAME GENDER as the prisoner,
    and will be conducted in an area
    that affords COMPLETE PRIVACY.

2.  The strip search and/or visual body cavity search shall be recorded
    on the incident report.  The incident report shall include the facts supporting the
    probable cause determination, the name of the
    officer performing the search, and the location where the search is conducted.

3.  Any evidence or property discovered shall be seized, recorded
    and secured in the normal manner, and recorded on the incident
    report as well as on the booking sheet.  If no evidence is found,
    the reporting officer shall make a notation to that effect on the
    incident report.

4.  Arrestees may be requested to manipulate their own body parts.
    Police officers may not touch or prod any body part. In the
    event that the strip search and/or visual body cavity search is
    not accomplished, due to a lack of cooperation on the part of the arrested person, the
    Duty Supervisor shall determine whether
    or not the arrested person is placed in a cell or kept under guard.

    Police officers are prohibited from conducting a strip search
    and/or visual body cavity search outside the confines of the
    District Station, except in cases of an authorized search
    warrant for a dwelling, building, or other place that specifies
    a search of a specific person and/or "any person present."
    In no event shall force be applied to accomplish a strip search
    and/or visual body cavity search unless authorized by a warrant.
    If the warrant specifies the search of "any person present"
    and the superior officer in charge of the search has probable
    cause to believe that a person present has a weapon, contraband,
    or the fruits or instrumentalities of the crime that he/she could
    not reasonably expect to discover without forcing the person
    present to discard all of his/her clothing, he/she may conduct
    a strip search and/or visual body cavity search.  All

responsibilities listed for the Duty Supervisor in this section
shall be transferred to the superior officer in charge of the search.

Sec. 5 BODY CAVITY SEARCH:

Body cavity searches may only be conducted when authorized by a
warrant. It shall be the responsibility of the Duty Supervisor to make the
determination whether a warrant should be sought authorizing a body
cavity search.

NOTE: Precautions should be taken by police officers when handling evidence recovered in this
fashion, such as wearing protective gloves.

Body Cavity Search Procedure

1.    Under no circumstances shall a body cavity search be conducted by a police officer.

2.    If an officer has a high degree of probable cause to believe that a weapon,
contraband, or the fruits or instrumentalities of the crime may be secreted in a body
cavity of the arrested person, a search warrant shall be sought. This applies even when
an item may be viewed partially protruding from the body cavity. If the arrested person
personally extracts any items from their own body cavity, no such warrant will be
necessary

3.    The Duty Supervisor, or his designee, shall make application for the warrant in
accordance with established Department procedures (See Special Order 95-5).

4.    Only a judge may issue such a warrant.

5.    Only a qualified medical professional, pursuant to a warrant, may conduct an
intrusion of a body cavity, or extract any items from the body cavity. After the warrant is
issued, the arrested person shall be transported to a medical facility so that a qualified
medical professional may extract any items from the body cavity. The Duty Supervisor
shall ensure that the arrested person is constantly monitored during this trip to the
medical facility until such time that the body cavity search is completed.

6.    The body cavity search shall be recorded on the incident report, including the name
of the physician conducting the search, the name of the officer seizing the evidence or
property, the name of the authorizing Duty Supervisor, and the facts contributing to the
high degree of probable cause determination. The arrested person shall then be
transported back to the station where the evidence or property discovered shall be
seized, recorded and secured in the normal manner, and recorded on the incident

report as well as on the booking sheet.  If no evidence is found, the reporting officer shall make a notation to that effect on the incident report.

Note: Although not considered a body cavity search, in the event that an arrested person creates an exigent circumstance by endangering his or her own health by swallowing an item, the arrested person shall be immediately transported to a medical facility for treatment. The Duty Supervisor shall ensure that the arrested person is constantly monitored during the trip to the medical facility until such time that the treatment is completed. Any evidence or property recovered by medical personnel shall be seized, recorded and secured in the normal manner, and recorded on the incident report, as well as on the booking sheet. A search warrant is not necessary in those cases where medical personnel perform an operation necessitated by good medical practice, for medical reasons, and only incidentally results in the recovery of evidence for police use.

Kathleen M. O'Toole
Police Commissioner

**EXHIBIT B**


**Diagram - Tailbone**

